# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| C & J INVESTMENTS, LLC, a Utah limited liability company,<br><br>            Plaintiff,<br><br>v.<br><br>THE NATIONAL CENTER FOR CONSTITUTIONAL STUDIES, a Utah not-for-profit corporation, and ZELDON NELSON, an individual,<br><br>            Defendants. | **MEMORANDUM DECISION REPORT AND RECOMMENDATION** and **ORDER REGARDING SEALED DOCUMENTS**<br><br>(filed under seal)<br><br>Case No. 2:09-cv-00359-DB<br>District Judge Dee Benson<br><br>Magistrate Judge David Nuffer |

District Judge Dee Benson referred this case to the magistrate judge pursuant to 28 U.S.C § 636(b)(1)(B) calling for a report and recommendation for the proper resolution of dispositive matters.[1]  This case concerns the copyrights of *The Making of America* and *The 5000 Year Leap* ("the Works"), two books written by the late author W. Cleon Skousen ("Skousen").  The parties filed cross-motions[2] for Partial Summary Judgment.

Plaintiff C & J Investments, Inc. ("C & J") seeks an order declaring that C & J is the rightful and legal owner of the copyrights in the Works and that, at least since August 31, 2007, Defendants' continued printing and distribution of the Works constitutes infringement on C & J's copyrights.[3]  C & J's claim of copyright ownership stems from registrations granted by

---

[1] Order of Reference, docket no. 101, filed January 11, 2011.

[2] Status Report ¶¶ 2, docket no. 72, filed September 1, 2010; Plaintiff's Motion for Partial Summary Judgment, docket no. 80, filed September 27, 2010; Defendants' Motion to Establish Validity, docket no. 83, filed September 28, 2010.

[3] Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (Plaintiff's Supporting Memorandum 81), docket no. 81, filed September 27, 2010.

the U.S. Copyright Office on September 7, 2007[4] that were based on a 2005 copyright transfer[5] ("2005 Assignment") from Skousen to C & J.[6]

Defendants The National Center for Constitutional Studies ("NCCS") and Zeldon Nelson ("Nelson") seek an order in their favor declaring that a 1988 "Exclusive Licensing & Royalty Agreement" ("1988 Agreement")[7] conveys an exclusive rights [sic] of copyright to NCCS as the holder of exclusive publishing and marketing rights to the two Works . . . ."[8]

For the reasons set forth below, the magistrate judge recommends that Plaintiff's Motion for Partial Summary Judgment be GRANTED and Defendants' Motion to Establish Validity be DENIED.

---

[4] The Certificates of Registration are Exhibit 56 to the Amended Stipulated Statement of Facts (Facts), docket no. 87, filed under seal November 5, 2010.

[5] Facts ¶¶ 388, 411, and Exhibit 51.

[6] Plaintiff's Motion for Partial Summary Judgment at 2.

[7] The Exclusive Licensing & Royalty Agreement is Exhibit 35 to the Facts. The Exhibits were filed piecemeal, with Exhibits 1-22 filed under seal September 10, 2010 as docket no. 74. The courtesy copy of this set of exhibits includes Exhibits 1-54. Exhibits 1-58 were presented in a courtesy copy delivered September 27, 2010 with the [First] Sealed Amended Stipulated Statement of Facts, filed under seal as docket no. 82. That filing contains Exhibits 1-58 On November 5, 2010, the [Second] Sealed Amended Stipulated Statement of Facts was filed under seal as document no. 87, and it states it contains an addition to Exhibit 4; an Exhibit 32 ["intentionally left blank in the September 27, 2010 filing]; an addition to Exhibit 41; and Exhibits 63-68. On February 28, 2011, an email was received by the magistrate judge containing Exhibit 52, and noting that "in some of the copy sets, Exhibit 54 materials appear to have been included under the Exhibit 52 label by mistake." Email February 28, 2011 from Paul Savage to David Nuffer enclosing corrected Exhibit 52, docket no. 106, filed under seal November 1, 2011.

[8] Defendants' Motion to Establish Validity at 2.

# Table of Contents

BACKGROUND ................................................................................................. 1

FACTS ............................................................................................................ 4

DISCUSSION ................................................................................................. 18

    **I.  Summary Judgment Standard** ........................................................ 18

    **II.  Elements of C & J's Copyright Infringement Claim** ................................. 19

    **III.  Evaluating Valid Copyright Ownership** ............................................ 19

    **IV.  Evaluation of Alleged Transfers of Copyright Ownership** ....................... 20

    **V. The 1988 Agreement Was Abandoned** ............................................. 21

    **VI.  The 1988 Agreement Was Breached** ............................................. 26

    **VII.  The Transfer to Nelson is Void** .................................................. 27

    **VIII.  The 2005 Assignment to C&J is Valid** ....................................... 28

    **IX.  Even if the 1988 Agreement Were Valid, the 2005 Assignment Would Control** 29

    **X.  NCCS/Nelson Do Not Have a Valid Non-Exclusive License** ................... 30

RECOMMENDATION ...................................................................................... 32

NOTICES TO PARTIES ................................................................................... 32

# BACKGROUND

The parties submitted over 200 pages - including 447 paragraphs - of stipulated facts and 68 exhibits (consisting of nearly 700 pages) to facilitate determination of the cross-motions for Partial Summary Judgment.[9] This section draws from the [Second] Amended Stipulated Statement of Facts ("Facts") to give a general background to the dispute. Later, the material facts will be recounted in more detail.

"This case is simultaneously both simple and exceptionally complex: simple, because the respective legal arguments are straight-forward, and not particularly novel; complex, because the factual underpinnings involve the messiest areas of the human experience, including differences over religion, politics, family livelihoods and legacies . . . ."[10] "The forty-year saga contained in the statement of stipulated facts reads like a novel."[11] The record is unlike many others because "not only [is] the dispositive signatory to key documents deceased, but principals in key entities had forgotten entirely what they had stated [while] actions taken . . . were dutifully recorded in the minutes of each organization or [in] comprehensive journals."[12]

The key document for the claims by NCCS/Nelson was "unknown to counsel before litigation was filed."[13] Further, "in this case, approximately one-half of the key documents relied on by the parties were drafted by non-lawyers that seemed to be unaware of the legal context in which there [sic] language would be applied."[14]

---

[9] [Second] Amended Stipulated Statement of Facts, docket no. 87, filed under seal November 5, 2010.

[10] Plaintiff's Supporting Memorandum 81 at ii.

[11] Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment (Corrected Version) (Defendants' Opposition Memorandum 91) at 84, docket no. 91, filed under seal November 9, 2010.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 83.

In 1971, Skousen founded a Utah non-profit corporation to promote awareness and education of the Constitution called the Freemen Institute.[15]  The Institute's name changed to the National Center for Constitutional Studies in 1984.[16]  In 1980, Skousen formed C & J Investments, a Utah limited partnership, for financial management and estate planning purposes.[17]  Skousen wrote *The 5000 Year Leap* in 1981 and *The Making of America* in 1985.[18] In 1989 Skousen resigned as Chairman of NCCS in order to pursue his writing and public speaking interests.[19]

Nelson became involved with NCCS in 1986 when he funded the second printing of *The Making of America* with $200,000[20] he obtained from a federal agricultural loan secured by his parents' assets.[21]  Nelson also funded a printing of *The 5000 Year Leap* in 1987[22] and thereafter regularly participated in and funded NCCS's book publishing operations.[23]  Because of NCCS's inability to repay a Nelson loan, Nelson seized several NCCS assets in 1992, including "printing rights" in the Works.[24]  Nelson became a NCCS board member in 1993[25] and "CEO" in 1995.[26]

[15] Fact ¶ 9.

[16] *Id.*

[17] Fact ¶ 23.

[18] Facts ¶¶ 41, 78.

[19] Fact ¶ 290 and Exhibit 42.

[20] Exhibit 5; *see also* Exhibits 6-7; *see also* Fact ¶ 95.

[21] Fact ¶ 108; Exhibit 6, Nelson Depo., 34:6-37:19.

[22] Exhibit 18.

[23] Fact ¶ 298.

[24] Facts ¶¶ 324-3250.

[25] Fact ¶ 333.

[26] Fact ¶ 342(a).

Eventually, Nelson gained exclusive control of NCCS and serves as its current CEO and Chairman.[27]

In January 1988,[28] Skousen and NCCS executed a five-page "Exclusive Licensing & Royalty Agreement" to document the basis for royalty payments to Skousen.[29] The creation of the document was motivated by an ongoing audit of NCCS and a desire to keep the organization's tax-exempt status.[30] Neither Nelson nor a current C & J representative signed the 1988 Agreement [31] and no party to this litigation knew of the existence of the 1988 Agreement until this litigation was well underway.[32] The Agreement states that it supersedes prior agreements between the parties and that Skousen "licenses and assigns" to NCCS the "exclusive marketing rights" and "exclusive publishing rights" in the Works and other products in exchange for royalty payments.[33]

Skousen transferred his copyrights to C & J in 2004 and again in 2005.[34] The 2004 Assignment focused on royalty and publishing rights and the 2005 Assignment transferred Skousen's "copyright, royalty rights, publication rights" to C & J. Both documents were signed by Skousen and notarized.

---

[27] Exhibit 53.

[28] Fact ¶ 208.

[29] Exhibit 35.

[30] Facts ¶¶ 162, 169(a), 211; Exhibit 19.

[31] Fact ¶ 209. The 1988 Agreement was signed by Skousen and John Harmer, former president of NCCS.

[32] Facts ¶¶ 326, 396.

[33] Exhibit 35.

[34] Exhibits 47-48, 50-51.

After Skousen's death in 2006, C & J asked Nelson and others about any possible publishing relationships between Skousen and NCCS/Nelson.[35]  Nelson's response asserted his control of printing rights "associated with NCCS"[36] but never mentioned the 1988 Agreement.

In July through September 2007, national media personality Glenn Beck expressed interest in and began to publicize *The 5000 Year Leap*.[37]  On August 31, 2007, C & J applied for copyright registrations of the Works with the U.S. Copyright Office, which were granted on September 7, 2007.[38]  Later that same day, the parties met in an attempt to understand each other's respective legal positions regarding publication of the Works,[39] but failed to reach an agreement.[40]  A later attempt to settle in February 2009 also failed, leading to this litigation.[41]  In 2010, after this litigation commenced, NCCS applied for and received copyright registrations of the Works based on the 1988 Agreement.[42]

## FACTS

As mentioned, the parties stipulated to Facts to facilitate determination of the cross-motions for Partial Summary Judgment.  The more material facts are presented here, preserving the numbering from the parties' Amended Stipulated Statement of Facts.[43]  The facts appear here verbatim as stated by the parties, except that words in braces ({}) are clarifications.  *Omissions are not indicated.*

---

[35] Exhibit 52.

[36] Exhibit 53.

[37] Facts ¶¶ 403-404, 409.

[38] Exhibit 56.

[39] Exhibits 54-55.

[40] Exhibits 57-58.

[41] Exhibits 59-60.

[42] Exhibits 61-62.

[43] Docket no. 87, filed November 5, 2010.

9. On June 8, 1971, Skousen incorporated a Utah non-profit corporation named the Freemen Institute (the "Institute"). It formally began operations July 4, 1971. After its initial approval as a tax-deductible entity on March 14, 1973, an I.R.S. audit in 1979 provided the basis for reaffirmation of its 501(c)(3) status in 1982. In 1984, the Institute's name was changed to the National Center for Constitutional Studies ("NCCS").

23. In late 1980, Skousen encouraged the formation of C. & J. for his children and their spouses. C. & J. referred to Skousen's name "Cleon" and "Jewel", Skousen's wife.

31. On June 12, 1981, C. & J. received a check drawn on NCCS {Freeman Institute at the time} in favor of Skousen in the amount of $ 9,459.71 as royalty income for "Miracle of America". The check was made payable to "the Reviewer" which was a business name used by Skousen, the name being derived from his lengthy book "review" published as *the Naked Capitalist*.

35. In addition, minutes from July 3, 1981 reflect that a policy was established regarding manuscripts submitted for publication:

> Dr. Skousen . . . reported on the writing and creative area of the Freemen Institute stating that different individuals were submitting manuscripts that were ready for publication and suggested that anyone submitting a manuscript for publication that was not a paid member of the Freemen Institute staff be given a royalty of ten-percent of the gross price of all [subsequently published manuscripts] distributed by the Freemen Institute.

> "Dr. Skousen reported that this was a lower percentage than was customarily given to an author but felt that each of the writers who were submitting manuscripts would be agreeable to this arrangement. He suggested that each author also be given twenty-five copies of the book as authors['] promotion and be authorized to purchase as many books as the author would like to from the Freemen Institute at an author's discount of fifty-percent.

> The Board adopted his suggestion 11-0.

36. On July 19, 1981, minutes of a meeting with C. & J. and Skousen, state that Skousen's "new book, *The 5000 Year Leap*, [is] ready for print. The feeling is that it will be a bestseller and an excellent benefit to C. & J if C. & J. purchased the royalty rights. The royalty would be 10%." The royalty proposal was agreed to by Skousen and C. & J. management.

41. In the first printing of *The 5000 Year Leap*, the notice of copyright was placed as follows: "© 1981 W. Cleon Skousen. Published by the Freemen Institute. All Rights Reserved. Printed in the United States of America."

44. Pursuant to the assignment by Skousen of his royalty "rights" to the *Miracle of America*, C. & J. tax records show receipt from the NCCS {Freeman Institute at the time}of $9,012 in 1981. There is no record of any I.R.S. 1099-MISC form issued by NCCS to C. & J or Skousen.

45. C. & J. tax records show receipt from the Freemen Institute of $11,513 in *Miracle of America* royalties 1982. There is no record of any I.R.S. 1099-MISC form issued by NCCS to C. & J or Skousen.

66. C. & J. tax records show that no royalties were paid by the NCCS in 1983, but royalties of $10,150.36 were paid from an unrelated publisher for religious titles, the royalty rights to which were assigned by Skousen to C. & J. that year.

71. C. & J. tax records show that the Institute/NCCS paid no royalties in 1984, but royalties of $7,195 were paid from an unrelated publisher for religious titles.

78. On July 31, 1985, the *Making of America* went to press with anticipated delivery in about three weeks. It came off the press on or about August 27, 1985. The edition carried the following notice: "Copyright © 1985 by W. Cleon Skousen. All rights reserved. No part of this book may be reproduced in any form or by any electronic or mechanical means, including information storage and retrieval systems, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a review." (The same notice appeared in the Second edition, revised, 1986—the printing that Nelson funded).

86. C. & J. tax records show that NCCS paid no royalties in 1985, but an unrelated publisher paid royalties of $5,056.24 for religious titles. No IRS 1099 – MISC form was submitted to either C. & J. or Skousen.

95. In 1986, Defendant Nelson entered into a written agreement with NCCS to provide the funding for a third-party to do a second printing of 30,000 copies of The Making of America Among other things, the agreement contained the following terms:

    a. NCCS agrees to sell 30,000 copies of MOA at the "unit cost".

    b. Nelsons will place ½ of the "purchase price" in escrow immediately and the remainder after the books are printed, bound and stored in a designated warehouse.

    c. The Edward L. Robbins Special Trust would be created for both parties.

    d. NCCS shall pay trustee the printing and binding cost plus $1.50 for each book removed from the warehouse to go to the Nelsons.

    e. Nelsons will pay $2.50 per copy for each book taken by them to be dispersed as directed by NCCS.

f. Nelsons have "the option of paying for up to 30,000 copies of the next printing under the same provisions".

The Agreement was signed by Zeldon and Mary Lynne Nelson, Skousen (as President) and Glenn Kimber (as Executive VP). (A copy of the "1986 Agreement" is attached as Exhibit 5).

96. Nelson testified in 2010 that he had provided the funding {to print *The Making of America*} on the explicit commitment by Skousen that none of the funds supplied by Nelson for printing *The Making of America* or derived from the sale of the books would be used to pay a finder's fees or author's royalties.

97. Nelson testified in 2010 regarding the 1986 Agreement that "[t]his agreement was actually put together by Cleon. And he was dictating it to a secretary there. And you'll notice in this agreement here, there's no mention of royalty, because we had just covered that. No royalty." (Nelson Depo 23:4-8; the entire Nelson Deposition is attached as Exhibit 6)

115. On October 15, 1986, the Executive Committee of C. & J. met. Glenn Kimber informed the committee that the NCCS was going to transfer all inventory of *Naked Communist* and *Naked Capitalist* as settlement on royalties to C. & J. through September 15, 1986. Inventory on hand was 7,244 copies of the *Naked Communist* and 8,625 copies of the *Naked Capitalist* Comm. Harold was to submit a bid to Publisher's Press for the same volumes in order to establish value of inventory. Estimated at about $25,000. Although amount of royalties to C. & J. was greater, realization of collectability was suspect (nothing ever collected on royalties since beginning – 1980) and therefore this settlement may be the best alternative. Proposal seconded by Brent. Approved unanimously.

116. At Skousen's request, in 1992 Brent Skousen prepared a "recap" of C. & J.'s financial history which contained the following entry for 1986:

> NCCS has financial trouble and needs C. & J. help. So C. & J. finances $7,000 to print their U.S.I.Q. game to be sold and repaid to C. & J. at $9,000. C. & J. collects only $1,400. Royalty debts to C. & J. amount to approximately $53,000 but remained unpaid. Due to the collectability being suspect, C. & J. agrees to settle the debt by accepting $19,700 in book inventory consisting of 7,244 Naked Communists and 8,625 Naked Capitalists.

118. C. & J. tax records show that NCCS paid no cash royalties in 1986. Royalties of $8,757.46 were paid by an unrelated publisher for religious titles. In addition, C. & J. recognized as much as $21,824.02 as in-kind royalties for books received from NCCS.

141. On June 6, 1987, NCCS paid to C. & J. $9,815.80, designated as a royalty on sales of *The Making of America*. (C. & J. tax records for 1987 show this as the total amount received from NCCS for that year). There is no record of any I.R.S. 1099-MISC form issued by NCCS to C. & J or Skousen.

151. In a "Memorandum of Agreement" dated July 22, 1987 (the "1987 Agreement", attached as Exhibit 18), the Nelsons agreed to:

      a. "pay for the publishing of 10,000 copies of the <u>5,000 Year Leap</u>" and for 7,500 copies of <u>The Real Benjamin Franklin</u>.  They also agreed to "publish" 10,000 copies of the <u>The Real Thomas Jefferson</u>.

      b. A "trust fund" was to be created, "the L. Edward Robbins Special Trust."  For each volume removed from the Trust, NCCS was to pay to the trustee the printing and binding unit costs, plus a certain amount for each volume, ranging from fifty cents for softbound copies of the "Real" books, to $2.70 for each hardbound copy of <u>The 5,000 Year Leap</u>.

      c. The Nelsons could also buy <u>The 5,000 Year Leap</u> from NCCS for $1.20 per softbound or $1.50 per hardbound copies respectively.

      d. Lastly, NCCS agreed "that no other publishing rights of these books shall be granted without the consent of the Nelsons."

152. The reference in the text of the 1987 Agreement to "these books" was intended by both Nelson and NCCS to specifically refer to *The 5000 Year Leap*, *The Real Thomas Jefferson,* and *The Real Benjamin Franklin*.

153. The agreement was signed by the Nelsons, by W Cleon Skousen as President of NCCS, and by Ruth Kaiser.

154. Nelson testified in 2010 that prior to providing the funding required by the 1987 Agreement, Nelson met with Skousen and specifically insisted there would be neither finder fees on the money lent nor royalties paid on books published by reason of the funding of Nelson. Nelson reported Skousen agreed to the conditions required by Nelson.

160. On September 7, 1987, Alan Neves, a member of the Executive Committee, wrote to Harmer thanking him for serving for the past several months as the "ethics legal advisor". He notes that one of the major unresolved audit issues was the lack of "signed royalty agreements between Dr. Skousen and NCCS which he appears reluctant to sign."  Neves notes a special concern because the Church of Scientology lost its tax exempt status because of undocumented royalty arrangements with L. Ron Hubbard.

162. On September 11, 1987, Harmer responded to the September 7, 1987, inquiry by Neves. Harmer strongly recommended completing the audit, documenting the royalty relationships, and clarifying the MOA relationship with

appropriate documentation and distance. A copy of the letter is attached hereto as part of Exhibit 19.

169. On September 24, 1987, {NCCS employee} Ruth Kaiser wrote John Harmer that

> a. "We are strongly committed to moving forward and formulating royalty agreements between the NCCS and Dr. Skousen, and others. Enclosed is a royalty agreement which was worked up but with which Dr. Skousen has some undefined problems. I would appreciate your review of this document to identify problems it may contain from your perspective. Please feel free to make any recommendations for changes. As you indicated in your letter, these agreements need to be completed and signed as quickly as possible."

182. On November 2, 1987, the executive committee of the NCCS Board of Trustees noted: (See copy of minutes in Exhibit 23)

> a. "A review was made [of] the proposed Royalties Agreement with Dr. Skousen to complete the independent audit. Suggested changes were made which should be ready for approval at the next Executive Committee Meeting, with the understanding that Exhibit A, detailing the publications to be included is in place."

190. The journals of Skousen contain the following entry:

> (November 18, 1987, Wednesday) - I spent most of the day working on the royalties which are due to C. & J. by NCCS. Until recently Bryan has not kept inventory records of books and so he had to go all the way back to Lou's records around 1980 and work them in from there. However, some data from Brent's C. & J. minutes and some additional data from my file helped us put it all together. On the basis of our final study it looks as though NCCS owes C. & J. around 60,000 dollars. I have also loaned NCCS $26,000 to cover emergencies. (See Exhibit 4)

194. {NCCS} Executive Committee Minutes from December 9, 1987 contain the following:

> c. "The question was asked that if there are other 'sleeping alligators,' would there be a benefit to listing everything Dr. Skousen has written since NCCS came into being—to delineate what was Dr. Skousen's, what is NCCS' and what NCCS owes a royalty on. Discussion followed. The question was raised about the payment of past royalties, and Dr. Skousen said royalties had not been paid in many cases because there was no money to pay him back royalties. He said as far as he was concerned this issue was a moot point."

195. On December 11, 1987, the NCCS Board of Trustees met. Present were Skousen, nine other Board members, with guests John Harmer and Bryan Neville. (See Exhibit 29).

> a. Skousen reported in writing that "[t]he Royalty Agreement with Dr. Skousen is in the hands of the Executive Committee for review and analysis.

> e. "A Royalty Agreement has not yet completed, and he asked that the Board consider a motion that it be completed by year end so that it can be demonstrated that we acted in a timely fashion. It was suggested that Exhibit "A" of the Agreement be expanded to protect Dr. Skousen, his family, and NCCS. That it have three parts: 1) The things on which we owe royalties, 2) writings Dr. Skousen owns on which we do not owe royalties, and 3) the things which NCCS owns on which no royalties are owed to anyone. This would close any ambiguities. A discussion followed." [The Board approved that Exhibit A be so structured].

199. C. & J. tax records for 1987 show the payment on June 6, 1987 for $9,815.80 designated as a royalty on sales of *The Making of America* was the total amount received from NCCS for that year;

208. On January 18, 1988, Skousen and NCCS entered into a written agreement bearing the title of "Exclusive Licensing & Royalty Agreement" (the "1988 Agreement") that memorialized the rights and obligations of Skousen (as "Author") and NCCS (as "Publisher") regarding the *Miracle of America* (audio, video and study guide), *The 5000 Year Leap, The Making of America,* and two other titles. A copy of this Agreement is attached hereto as Exhibit 35.

214. Two days after 1988 Agreement was executed, NCCS sponsored a 75th birthday banquet at their headquarters in SLC in honor of Skousen, who recorded in his journal as follows:

> d. (January 31, 1988) - Glenn, Brent and I got on a conference [call] to discuss our royalties from the NCCS. He and Brent are going to work it out with Ed Robbins and then report back.

220. The 1988 budget revised on March 8, 1988, showed a budget for Skousen royalties of $2000 for February (first quarter) and had a zero for the second quarter; similarly, it contained a $3,000 projection for August (3rd quarter) and zero for 4th quarter.

243. Minutes from an NCCS Executive Committee Meeting on June 16, 1988 (attended by Skousen, Harmer, Jim Bartleson, Bert Smith, Alan Neves and Ruth Kaiser with guests Zeldon Nelson and Sheila Siggard) contain the following:

a. "A review was made of Zeldon Nelson's serious financial situation relative to the money he borrowed to reprint <u>The Making of America</u>. We need to assist him in this matter by moving the books in the trust more quickly. The possibility of his removing the books from the bonded warehouse to sell at a greatly reduced price without the payment of royalties was also discussed. It was suggested we look at the basic cost of the book to cover repaying Zeldon, Bert, and the Phillips, and waive the royalties. Dr. Skousen was approached about making a loan of $10,000 from his royalty trust to help Zeldon. He said his royalties have been assigned to a family trust and we would have to ask the family."

244. Skousen's journal contains the following:

a. (June 16, 1988, Thursday) – . . . We then had an extensive discussion to discover how we might best assist Zeldon Nelson who is in danger of losing his farm if more books aren't sold so he can receive enough to make his payments. *We are not selling hardly anything at NCCS.* Ruth wanted to know if I would loan some of the money in the C. & J. trust account for royalties. I told them I have no control over the trust account now that it is set up in the name of C. & J. Ruth said the trust account was up to about $15,000.

248. Skousen Journals contain the following:

a. (June 27, 1988, Monday) - . . .To rescue Zeldon Nelson, it was agreed we would wholesale about 8,500 copies of *The Making of America* at $7 per copy which is just what the printing cost. . . . I agreed to forego the royalty which is $2.50 per copy. By voting for this suggestion *I forfeited about $20,000*.

258. Skousen's journal entries include:

d. July 5, 1988. Tuesday**.** I arranged with Ed Robbins to release $ 12,534 worth of books to C. & J. Investments which NCCS owed to C. & J. in connection with the royalty trust fund. Harold and Brent worked with Ed to get them over to the storehouse on Appian Way this evening.

277. C. & J. showed no receipt of royalty payments from NCCS in 1988, but received $4,802 from other publisher(s) for religious titles. Skousen's journal entry for July 5, 1988 indicates that C. & J. received from Robbins, trustee, at least $ 12,534 in books. No IRS Form 1099-MISC was issued by NCCS or Robbins to either Skousen or C&J.

279. In 1988, Skousen made a charitable donation to NCCS for $ 25,000.

280. In January 10, 1989, Ed Robbins closed his trust accounts and reported by letter the dispersal {sic} of $3,365.22 to C. & J. and $780.00 directly to NCCS.

281. C. & J.'s tax records for 1989 show the January payment from Robbins as being the only royalty payment from NCCS in 1989. C. & J. also received royalties from another publisher for religious titles, and a few hundred dollars in royalties on *Making of America* workbooks sold by "I.C.E" in Cedar City.

290. On or about October 9, 1989, Skousen resigned as Chairman of the Board of Trustees of NCCS to pursue his other writing and public speaking interests. (See Exhibit 42)

298. On December 23, 27, 1989, Nelson and his immediate and extended family, loaned $200,000 to NCCS for the completion and printing of *The Real George Washington*. Sometime prior to Skousen's retirement, NCCS has worked up a cost analysis related to the completion and publication of *The Real George Washington* and *Soldiers, Statesmen, and Heroes*. See Exhibit 65.

299. In a security agreement dated January 31, 1990, NCCS granted to the Nelsons a security interest in certain NCCS assets, described on Exhibit A, as all books bearing the titles of Soldiers, Statesmen and Heroes, and The Real George Washington, and all "accounts, accounts receivable, books, instruments, documents, contract rights, chattel paper, inventory in all stages of production, equipment, furniture, supplies, money deposit accounts . . . and general intangibles, all now owned or hereafter acquired, and proceeds of all of the foregoing . . . ." A UCC-1 was prepared for Zeldon and Mary Lynne Nelson and for Leroy and Lillian Nelson. The security agreement is attached hereto as Exhibit 43.

300. On or about December 27, 1989, NCCS received a cash infusion loan from Nelson, his immediate family, and his parents of $200,000. Nelson was paid $ 50, 000.00 for providing an "inventory" of books to NCCS earlier that year.

311. On October 24, 1990, Jim and Sharon Bartleson, Jim Cox, Andrew Allison and Bob Bartleson from NCCS met with George LeRoy and Lillian Nelson and Zeldon and Mary Lynne Nelson at the NCCS offices for the purpose of "Financial and loan agreement review".

    o. "Zeldon also expressed concern about learning from Dr. Skousen during a recent telephone conversation that $11,000 in royalties would be due to C. & J. Trust from sales of <u>The Real George Washington</u>. He observed that there seem to be many violations of NCCS's agreement with his family. (Jim Bartleson interjected that he had no knowledge of any royalty agreement with C. & J. Trust until a few months after the December 23 meeting, when an accountant hired by NCCS to perform an

audit found a sketchy list of loans and related royalties on books, including <u>The Real George Washington</u>."

315. C. & J.'s 1990 tax records show royalty income of $10,240.39 for religious titles, of a total of $11,043.46 in royalties. The source of the other $803.07 in royalty income has not been identified.

320. C. & J. tax records for 1991 show total royalty income of $34,508, from various publishers of religious titles.

324. Because of the inability of NCCS to repay the loan is {sic} required, the Nelsons asserted possession of various assets of NCCS in 1991 and 1992. In December of 1992, a document executed by the President or NCCS, its CPA, and Nelson addressed the specific assets and rights previously held by NCCS that were transferred to Nelson and the outstanding debts of NCCS to Nelson that were thereby satisfied.

325. Minutes from a {NCCS} meeting dated December 10, 1992 show attendance by Zeldon Nelson, Andrew Allison, and CPA Don Anderson (Allison's Father-in-law) and refers to a "loan issued to NCCS in December 1989 by the Nelson family". (See Exhibit 45)

    d. The document assigns values (without supporting documentation) to the assets seized by Zeldon in October 1991, totaling $140,000, "divided as follows:

        i. NCCS library, office furnishings and equipment $33,000
        ii. NCCS mailing list $30,000
        iii. Copyrights and printing rights for NCCS books $77,000

    e. "The publications for which copyrights have been transferred to Zeldon A. Nelson are the following:

        i. The Real Thomas Jefferson
        ii. The Real Benjamin Franklin
        iii. The Real George Washington
        iv. Soldiers, Statesmen and Heroes
        v. I Love America, Part 1
        vi. Freedom Defined

    f. "The publications for which printing rights have been conveyed to Zeldon are the following:

        i. The Making of America
        ii. The Five Thousand Year Leap
        iii. The "Miracle of America" Study Guide
        iv. Other NCCS reports and monographs

326. The 1992 Minutes {for the meeting above} contain no mention of {the} 1988 Agreement, and both Nelson and Allison have stated that they had no knowledge of the existence of that agreement prior to 2009. In 2010, Robbins indicated that he had no recollection of assisting with either the 1988 or the 1992 Agreements.

333. Zeldon was added to the NCCS board in 1993 (reflected in the annual report filed in June, 1993).

341. On April 29, 1996, a fifty-five percent (55%) discount from retail price was given to Skousen family member Richard Skousen who purchased in bulk seventy-four (74) copies of the books on Exhibit A of the 1988 Agreement, one-hundred and forty books (142) books from the President's series, and forty (40) copies of Soldiers, Statesman and Heroes.

355. {Skousen journal entry}  (November 21, 1998, Saturday) - . . . Glenn brought in a huge box of books for me to autograph and about a dozen of them were *The Five Thousand Year Leap* in paperback. I inquired where he obtained them and he said Zeldon Nelson had a lot of them. Brent has nothing but hardbacks and only two cases of those, so it was good news to learn that Zeldon has a quantity.

361. Skousen's journal contains the following entries:

> f. (July 9, 2001, Monday) I called Zeldon Nelson who handles all of our NCCS publications and told him about Mark's great book and the fabulous wholesale prices he can get for us.

370. Skousen journal entries in May of 2003 state the following:

> h. (May 8, 2003, Thursday). . . Harold told me that Brent had been trying to get copies of *The Making of America* from Zeldon Nelson but he has ignored their request since last October. They therefore contacted the publisher to see if he would give us a bid so we can print an edition of these book ourselves. The publisher has the plates and said he would give us a bid on a couple of thousand copies. *I still have the copyright* [emphasis added] so they felt that we could do our own edition.

371. Notes from C. & J. contain the following entries for May 2003:

> May 19 2003: Skousen contacts Zeldon and Bert; makes 2nd unsuccessful attempt to arrange a meeting to discuss publishing and royalties. Harold Skousen contacts former NCCS attorney Ed Robbins regarding Copyrights and Publishing rights to Making of America in which Ed responded Skousen holds the copyrights and is "in the driver's seat" and

controls publishing rights. He suggested printing a new edition of the book.

373. There are no known journal entries for Skousen from July 1, 2004 through December 31, 2004.

385. NCCS phone records show that Skousen called Nelson April 12, 2005 (for 7 minutes). He requested the 1992 Foreclosure Minutes. Nelson again forwarded them to him. Skousen also asked if Nelson had any other documents that established Nelson's rights.

386. Skousen made no disclosure of 1988 Agreement or acknowledged the existence of the 1986 and 1987 Agreements that he had signed for NCCS that granted Nelson certain rights.

387. On June 6, 2005, Skousen executed and delivered to Brent Skousen, a manager of C. & J., an "Assignment of Copyrights," (hereinafter referred to as "2005 Assignment,") transferring "all of Assignor's right, title and interest, including but not limited to, copyright, publication rights, royalty rights in and to" the publications described on Exhibit A, which listed the "Works" among its many titles, and included "All other texts created by [or recordings of] W. Cleon Skousen." The Assignments was {sic}made before attorney Jeff Skoubye, who witnessed the signature as a Notary Public.

390. Skousen called Nelson twice on August 8, 2005 (for approximately 4 and 9 minutes). Nelson stated that Skousen did not tell Nelson of the 2005 Assignment or the 1988 Agreement.

394. Skousen died in January 2006 from blood loss resulting from a fall. Nelson attended the funeral.

395. Following Skousen's death, three of his sons, Paul Skousen, Brent Skousen, and Harold Skousen (as managers for C. & J.) continued to actively manage C. & J.'s portfolio of copyrighted works, including securing copyright registration of several of Skousen's writings over the course of the following two years.

396. In the Fall of 2006, C. & J. sent out letters to all known publishers of Skousen's writings (past and present), including Nelson/NCCS, and for historical purposes, Bert Smith, inviting publishers to provide copies of any documents that might be in existence in order to respect arrangements that had been made by the late Skousen during his lifetime. (copies of correspondence are attached in Exhibit 52). C & J managers had a recollection that their father had an agreement regarding royalties, but they had never seen such an agreement, nor were they certain that it had ever been in writing. After Skousen's death, they examined his files that contained royalty agreements, and did not find any involving NCCS. After litigation began, counsel for NCCS located the original 1988 Agreement.

During additional searching in connection with discovery, Skousen's copy of the 1988 Agreement was eventually located. It was kept in one of Skousen's chronological board books, with a note from Brian Neville, and its placement suggested that it was received at least six months after the agreement was executed.

398. In a response letter dated October 20, 2006 (received on November 1, 2006 by counsel for C. & J., and attached hereto as Exhibit 53), attorney David Gladwell wrote on behalf of Nelson that

> Some time {sic} in 1998 (sic), due primarily to the mismanagement of its affairs by members of Dr. Skousen's family, NCCS was about to close its doors and shut down its operation. In order to remain viable, it needed a substantial infusion of cash. Because of his devotion to its mission and his long standing relationship with Dr. Skousen, Mr. Nelson agreed to lend NCCS Two Hundred Thousand Dollars ($200,000.00). Appropriate security agreements and U.C.C.1 financing statements were prepared and duly filed, placing Mr. Nelson and his parents (contributors of a portion of the $200,000.00) in a first position in all of the assets of NCCS, including all printing and publishing rights associated with NCCS. As an example, NCCS funded all of the research required to provide the underlying data and sources for the compilation and the publication of The Making of America.

> Due to NCCS's default in repaying the obligation to the Nelsons, NCCS relinquished and turned over to Nelson all of the assets of NCCS. This occurred in approximately October of 1991. Since that date, Mr. Nelson has been primarily responsible for the continued operation of NCCS. NCCS continues to print and publish most of the works owned by NCCS, including The Making of America. Dr. Skousen made various contributions to many of those works.

> At the time Mr. Nelson assumed the operating control of NCCS, NCCS owed creditors approximately $600,000.00, including priority debts owed to the Utah Department of Employment Security and a variety of vendors who provided goods and services to NCCS. NCCS has, under the leadership of Mr. Nelson, retired a healthy portion of that indebtedness thereby preserving the work and mission of NCCS and, because of Dr. Skousen's foundational work in the NCCS, the good reputation and legacy of Dr. Skousen.

403. On July 25, 2007, Glenn Beck called Zeldon Nelson on phone and they talked for about 20 minutes. Beck said he liked *The 5000 Year Leap* and that he might help promote it in September. Beck requested copies of all NCCS products, which NCCS promptly sent by 2nd day UPS.

407. On August 31, 2007, C. & J. (by counsel) submitted its copyright registration applications via U.S. mail for the Works.

408. Later that day, C. & J. managers, accompanied by counsel, met with Nelson and Bert Smith on the premises of the Smith & Edwards store in Ogden, Utah. Counsel for NCCS was not present, but Nelson and Smith desired to proceed. The best available transcript (from a recording by Zeldon Nelson) is attached as Exhibit 55. After more than three hours, C. & J. representatives left the meeting with the understanding that the parties had finally agreed upon royalties to be paid "in-kind."

409. In the meantime, in early September 2007, radio and t.v. personality Glenn Beck began promoting *The 5,000 Year Leap* on his radio show. Hearing the promotion, Paul Skousen inquired with Glenn Beck's staff whether he would be interested in doing a forward to a new commemorative edition of *The 5,000 Year Leap.*

411. Based on the 2005 Copyright Assignment from Skousen to C. & J., effective September 7, 2007, the Works were registered {by C. & J.} with the U.S. Copyright Office.

416. On November 15, 2007, a second phone request was made by Brent Skousen to Nelson to execute a one-page license document.

417. C. & J. management remained uncertain how to proceed with any projects regarding the Works in light of Nelson's refusal to sign any agreements because of the perceived threats by Bert Smith that enforcement actions would result in harming Skousen's reputation.

426. On January 23, 2009, NCCS sold to Plaintiff C. & J. Investments fifty (50) copies of *The Making of America* at $ 15.00 per book, an approximate fifty percent (50%) discount of the list price of $ 29.95. At the same time, NCCS sold to Plaintiff two-hundred (200) copies of soft bound version of *The 5000 Year Leap* at $ 2 per book, reportedly approximating the printing cost of the book to NCCS.

{Negotiations between these parties failed to produce an agreement.}

438. Due to the promotion of *The 5000 Year Leap* by Glenn Beck and a link from his website to the NCCS website, between the August 31, 2007 meeting and February 19, 2009, there was a marked increase in the demand for books from NCCS.

443. The 30th anniversary edition of *The 5000 Year Leap* published by PowerThink Press, LLC on behalf of C. & J. contains the following at the beginning of the notice of copyright: "© 1981, 2009 W. Cleon Skousen; C. & J. Investments. All Rights Reserved."

447. In 2010, NCCS filed copyright registrations for The 5,000 Year Leap
(granted on Feb. 4, 2010; see Exhibit 61) and for the Making of America (granted
February 26, 2010; see Exhibit 62).

## DISPUTED FACTS

In response to C & J's Memorandum in Support of Motion for Partial Summary

Judgment, NCCS/Nelson dispute 15 fact discussions presented by C & J and also present three

additional facts independent of the Amended Stipulated Statement of Facts.[44]  As C & J points

out, NCCS/Nelson do not actually dispute facts, but rather only C & J's analysis of the facts.

This decision deals with the NCCS/Nelson arguments where material.

## PARTIES' POSITIONS

C & J asserts that NCCS and Nelson have no rights to print, update, publish or market

either of the Works.  C & J claims NCCS/Nelson have infringed the C & J copyrights.

NCCS claims that it has the exclusive "publishing rights" and "marketing rights" to both

of the Works.  NCCS has not claimed copyright infringement by C & J but seeks a declaratory

order as to the validity of the 1988 Agreement and the subsequent NCCS copyright registration.

## DISCUSSION

### I.  Summary Judgment Standard

"Summary judgment is appropriate if 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.'"[45]  In deciding a motion for summary judgment, the court reviews the facts in the light

most favorable to the nonmoving party.[46]

---

[44] Defendants' Opposition Memorandum 91 at 2-82.

[45] *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)).

[46] *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009).

## II. Elements of C & J's Copyright Infringement Claim

C & J asserts copyright infringement of the Works by NCCS/Nelson. C & J only claims infringement since the parties' meeting on August 31, 2007, which is also the date that C & J applied for copyright registrations of the Works.

According to the Tenth Circuit and United States Supreme Court, C & J must prove "two elements to [succeed on] a copyright infringement claim: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"[47] Because NCCS/Nelson clearly copied and distributed the Works both before and after the parties' 2007 meeting,[48] only the first element is at issue.

## III. Evaluating Valid Copyright Ownership

According to the 1976 Copyright Act, copyright ownership "vests initially in the author or authors of the work."[49] The parties have stipulated that Skousen is the author, and therefore the original copyright owner, of the Works.[50] Both parties claim copyright ownership from Skousen through transfers made 17 years apart, first to NCCS/Nelson in 1988 and later to C & J in 2005.

Although both parties were granted copyright *registration* based on those respective transfer documents, neither party can establish ownership simply based on their respective registrations for two reasons. First, copyright registration is "not a condition of copyright

---

[47] *La Resolona Architechts, PA v. Reno Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).

[48] Fact ¶ 438.

[49] 17 U.S.C. § 201(a).

[50] Fact ¶ 1.

protection."[51]  Second, the registrations were granted more than five years after the Works were

published,[52] the timeframe for presumptive validity under the Copyright Act.[53]

Under the Copyright Act, the owner of a copyright has the exclusive rights, among

others, to (a) reproduce, (b) prepare derivative works of, and (c) distribute copies of the

copyrighted work.[54]  A copyright owner's authorization of others to do these things is a transfer

of copyright ownership.

## IV. Evaluation of Alleged Transfers of Copyright Ownership

A "transfer of copyright ownership" is defined in the Copyright Act as "an *assignment*,

mortgage, *exclusive license*, or any other conveyance, alienation, or hypothecation of a copyright

or *of any of the exclusive rights comprised in a copyright*, whether or not it is limited in time or

place of effect, *but not including a nonexclusive license*."[55]  An author may transfer ownership in

the copyright, in whole or in part,[56] by a signed writing.[57]  "A transfer of copyright ownership,

other than by operation of law, is not valid unless an instrument of conveyance, or a note or

memorandum of the transfer, is in writing and signed by the owner of the rights

conveyed  . . . ."[58]

---

[51] 17 U.S.C. § 408(a).

[52] *The 5000 Year Leap* was published in 1981 (Fact ¶ 41); *The Making of America* was published in 1985 (Fact ¶ 78).

[53] 17 U.S.C. § 410(c).

[54] 17 U.S.C. § 106(1)-(3).

[55] 17 U.S.C. § 101 (emphasis added).

[56] 17 U.S.C. § 201(d)(1).

[57] 17 U.S.C. § 204(a).

[58] *Id.*

A transfer need not include all rights of the copyright holder. "Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately."[59]

## V. The 1988 Agreement Was Abandoned

The 1988 Agreement was abandoned for reasons discussed below. Thus, a thorough examination of the Agreement's validity at its inception is unnecessary. However, the unusual nature of the 1988 Agreement bears brief examination.

The 1988 Agreement is titled "Exclusive Licensing & Royalty Agreement" but the recital refers to its purpose as "consolidat[ing] into one written agreement the understanding of the parties with regard to the ownership of the exclusive marketing rights to and the said royalty payments to" the listed publications.[60] The purpose of the 1988 Agreement was to avoid loss of the tax exempt status of NCCS and to satisfy auditors.[61] While the 1988 Agreement has broad language licensing and assigning exclusive publishing rights, it specifically refers to the copyrights being vested in Skousen even during the term of the Agreement, and imposes on him the duties of renewal and protection of the copyrights. Because the 1988 Agreement was drafted by non-lawyers, the parties' understanding of terms is not clear.

But it is clear the 1988 Agreement never meant anything to the parties other than a device to satisfy auditors. In fact NCCS/Nelson repeatedly showed they did not rely on any agreements.

- During a October 24, 1990 meeting, NCCS President Jim Bartleson stated he "had no knowledge of any royalty agreement with C. & J. Trust until a few months after the December 23 [1989] meeting, when an accountant hired by NCCS to

---

[59] 17 U.S.C. § 201(d)(2).

[60] Exhibit 35 at 1.

[61] Facts ¶¶ 160, 162.

perform an audit found a *sketchy list of loans and related royalties on books. . . .*[62]  Notably, this shows the NCCS president and account are unaware of any agreements, just "lists."

- In the 1992 NCCS Foreclosure Minutes regarding Nelsons seizure of NCCS assets, there is only a mention of "printing rights" in the Works and those rights are listed separately from copyrights.[63]

- In April 2005, Skousen called Nelson and "asked if Nelson had any other documents [besides the Foreclosure Minutes] that established Nelson's rights."[64] The 1988 Agreement was not discussed.[65]

- In 2006, after Skousen's death, "C. & J. sent out letters to all known publishers of Skousen's writings (past and present), including Nelson/NCCS, and for historical purposes, Bert Smith, inviting publishers to provide copies of any documents that might be in existence in order to respect arrangements that had been made by the late Skousen during his lifetime."[66]  The responsive letter from Nelson's lawyer recited only Nelson's story of the 1991 foreclosure of NCCS publishing rights, not any agreement supporting those rights.[67]

- In the August 31, 2007 meeting between the parties, Nelson did not discuss the 1988 Agreement.[68]

---

[62] Fact ¶ 311(o) (emphasis added).

[63] Exhibit 45.

[64] Fact ¶ 385.

[65] Fact ¶ 386.

[66] Fact ¶ 396.

[67] Fact ¶398.

[68] Fact ¶ 408 and Exhibit 55.

- Neither party knew of the document's existence until discovery in this litigation.[69]

The parties' disregard of the 1988 Agreement shows that it was abandoned. Even if parties have a relationship, and continue in it, an agreement may be abandoned by a failure to refer to it or perform according to its terms. In *Salazar v. Christensen*,[70] Judge Kimball considered a claim for retirement benefits under a contract which he found was abandoned. While the Plaintiffs continued to work for eight years after the contract was signed, "Plaintiffs were not compensated according to the terms of the Employment Agreement [and] never demanded that they receive compensation pursuant to the Employment Agreement . . . ."[71] They "abandoned any rights they had under the Employment Agreement because during their years of employment [they] acted inconsistent with the existence of a contract."[72] NCCS/Nelson never acted as if there was agreement, even when specifically asked for the basis of their rights.

In *Salazar,* Judge Kimball relied on a Utah Supreme Court case, *Parduhn v. Bennett*.[73] The parties in that case disputed entitlement to proceeds of a key man life insurance policy intended to fund a partnership buy-out. The business asset had been sold less than a month before one of the partners died. The court held the buy-sell agreement was of no efficacy, since there was "no business, and neither [partner] owned a one-half interest in any business." While the *Parduhn* decision turned on the doctrine of discharge, the court's explanation of the law extended to abandonment, and applies in this case. "A contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract, and mutual assent to abandon or rescind a contract may be inferred from the attendant circumstances

---

[69] Facts ¶¶ 326, 396.

[70] No. 2:02CV473 DAK, 2003 WL 23356434 (D. Utah Dec 22, 2003).

[71] *Id.* at*2.

[72] *Id.* at*4.

[73] 61 P.3d 982 (Utah 2002).

and conduct of the parties."[74]  NCCS/Nelson and Skousen acted as if they had some sort of

relationship but nothing in their actions referred to or can be said to be performance of the 1988

Agreement.

There is no evidence in the record that any royalties have ever been paid under the 1988

Agreement.  NCCS/Nelson *argue* that royalties were paid on a few occasions after 1988, but fail

to provide any *evidence* that royalties were ever paid for the Works in reference to the 1988

Agreement.

First, NCCS/Nelson argue that NCCS paid "in kind" royalties on July 5, 1988 to C & J

with $12,534 of books.[75]  The argument's strength is diminished by the fact that Skousen

himself, and not another NCCS officer, arranged for the book delivery to C & J.[76]

NCCS/Nelson also point to Skousen's journal entry written only five months after he

signed the 1988 Agreement that indicated C & J had $15,000 in a royalty trust account.[77]

NCCS/Nelson fail to point out, however, that Skousen acknowledged in the same journal entry

that "[w]e are not selling hardly anything at NCCS,"[78] indicating most of the $15,000 in C & J's

trust account came from somewhere other than royalties from sales of the Works during the

previous five months.

Next, NCCS/Nelson claim "NCCS gave Skousen a 50% discount on all purchases he

made for himself of the two Works. As this was a greater discount than the 40% discount given

to persons and entities involved in reselling the book, Skousen received, in fact, a 10% benefit on

---

[74] *Id.* at 985 (citing 17A Am.Jur.2d Contracts § 558 (1991) and noting accord in *Green v. Garn*, 11 Utah 2d 375, 359 P.2d 1050, 1054 (1961) and *Copper King Mining Co. v. Hanson*, 52 Utah 605, 176 P. 623, 625 (1918)).

[75] Fact ¶ 277.,

[76] Fact ¶ 258(d).

[77] Fact ¶ 244a.

[78] *Id.*

each book that he purchased."[79]  However, the stipulated facts show that during a 1981 meeting the NCCS board unanimously adopted Skousen's suggestion "that each author [. . .] be authorized to purchase as many books as the author would like to from [NCCS] at an author's discount of fifty-percent."[80]  This right to a 50% discount existed independently from the 1988 Agreement.

Finally, NCCS/Nelson point to a one-time cash payment of $3,365.22 from NCCS in January 1989 as evidence of royalties paid.[81]  Although the payment stemmed from sales of the Works for the year starting January 1988,[82] the payment had no connection to the 1988 Agreement.  Also, there were payments to both NCCS and C & J.  In a 1989 letter explaining the disbursal of the trust account's funds the trustee calculated the payment under 1987 instructions from Skousen[83] and made  no mention of the 1988 Agreement.  As such, the $3,365.22 payment is not referable to the 1988 Agreement.

At most these back-and-forth transactions without any regular form indicate the parties were doing anything but complying with the agreement.  Two Utah cases have held that parties' continued exploration of other options and behavior on terms at variance from the contract are evidence of abandonment. [84]

> A contract will be treated as abandoned when one party acts in a manner
> inconsistent with the existence of the contract and the other party acquiesces in
> that behavior.[85]

[79] Defendants' Opposition Memorandum 91 at 10.

[80] Fact ¶ 35.

[81] Fact ¶ 280.

[82] Exhibit 41.

[83] Exhibit 24.

[84] *Eldridge v. Farnsworth*, 166 P.3d 639 (Utah App. 2007); *Harris v. IES Associates, Inc*., 69 P.3d 297 (Utah App. 2003).

[85] *Harris,* 69 P.3d at 308 (citing 17A Am.Jur.2d Contracts § 543 (1991) (quotations omitted)).

Here the parties continued a relationship but on an ad-hoc basis that reflected their long history of doing what worked regardless of what the agreements might require.

## VI. The 1988 Agreement Was Breached

The lack of any royalty payment with reference to the agreement not only evidences abandonment of the agreement but also is a material breach that defeats the objective of the contract for Skousen.[86] "[T]he classic example of material breach is failing to pay royalties due to the assignor or licensor."[87]

NCCS/Nelson argue a lack of royalty payments to Skousen would not invalidate the 1988 Agreement because "Skousen waived his rights to the same or was without the ability to require their payment."[88] Skousen sometimes deferred the requirement of royalty payments, especially during periods of financial difficulty for NCCS or for Nelson.[89] But this occurred before and after the 1988 Agreement because NCCS was always in financial crisis. NCCS/Nelson offer nothing to show any waiver or deferral related to the 1988 Agreement. And they make no allegation that Skousen *permanently* or *always* waived the royalty requirements. In fact, evidence suggests Skousen intended for C & J to receive royalties whenever possible over the last 20 years. Just five months after signing the 1988 Agreement, Skousen lamented in his journal that he "*forfeited about $20,000*" by foregoing royalties on *The Making of America* in order to "rescue Zeldon Nelson" from his financial troubles.[90]

---

[86] *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 450-451 (Utah 1979).

[87] 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 10.15[A] (Matthew Bender, Rev. Ed. 2010).

[88] Defendants' Opposition Memorandum 91 at 10.

[89] Fact ¶ 248(a).

[90] *Id.*

In two places, the 1988 Agreement expressly provides that any amendments must be in a writing signed by the parties.[91]  NCCS/Nelson do not offer any written waiver of royalties or amendment of the 1988 Agreement.

## VII.  The Transfer to Nelson is Void

Nelson bases his claims on his seizure of assets of NCCS in October 1991.  Of course, Nelson's claims to the copyrights are no stronger than the claims of NCCS under the 1988 Agreement, which have already been discussed as invalid.   But there are additional reasons Nelson could not claim through the supposed foreclosure.

The 1989 documents provided as evidence of the security interest do not reference any copyrights or publishing rights.[92]  They do not reference the 1988 Agreement.  Thus the security documents themselves do not establish any claim in favor of Nelson.  While Nelson's attorney stated in 2006 that the security interest included "all printing and publishing rights of NCCS" there is no basis for this claim in the documents.[93]

The Minutes of an NCCS meeting in December 1992[94] state that in October 1991 Nelson took possession of hard assets including "NCCS library, office furnishings and equipment" and that certain copyrights and printing rights were transferred to Nelson.  There is no reference to the 1988 Agreement.  Further, no documentation of the seizure or default proceedings are provided so there is no evidence supporting the actual transfer of any NCCS assets to Nelson.

Finally, any attempt to encumber rights under the 1988 Agreement in favor of Nelson[95] would violate and be invalid under the 1988 Agreement.  The 1988 Agreement expressly states

---

[91] 1988 Agreement ¶¶ 4-5.

[92] Exhibit 43.

[93] Exhibit 53.

[94] Exhibit 45.

[95] Fact ¶ 325 and Exhibit 45.

that the rights under the agreement are "non-transferable and non-assignable without the consent of the author, his heirs and assigns."[96]  The 1988 Agreement again states "the rights of the Publisher hereunder are not assignable or transferable without the consent of the author or his heirs or assigns."[97]  If the loan documents had attempted to pledge of any rights under the 1988 Agreement, the attempt would have been void, and if there had been a valid foreclosure, it would be as void as the pledge.

## VIII.  The 2005 Assignment to C&J is Valid

Skousen executed various transfers related to the Works in favor of C & J in 2004[98] and 2005.[99]  Because C & J used the 2005 Assignment to obtain its copyright registrations for the Works in 2007, this transfer is discussed in this Report.

The 2005 Assignment is valid on its face.  NCCS/Nelson agree that "the language of the assignment itself is unambiguous as it relates to what is being conveyed. As such, the court does not need to go beyond what is contained in the document."[100]  The document straightforwardly transferred to C & J all of Skousen's "right, title and interest, including, but not limited to, copyright, publication rights, royalty rights, in and to the certain books and publications more particularly described in Exhibit A attached [t]hereto."[101]

---

[96] Exhibit 35 at 1-2.

[97] *Id.* at 2.

[98] Exhibits 47-48.

[99] Exhibits 50-51.

[100] Defendants' Opposition Memorandum 91 at 101.

[101] *Id.*

NCCS/Nelson argue that the 2005 Assignment does not overcome the 1988 Agreement because the assignment only conveys all of Skousen's "right, title and interest."[102] But given the invalidity of the 1988 Agreement, the 2005 Assignment is a fully effective conveyance.

## IX.  Even if the 1988 Agreement Were Valid, the 2005 Assignment Would Control

Even if the 1988 Agreement were valid, C & J's *registration* of the Works in 2007 gives C & J priority claim.  17 U.S.C. § 205(d) provides that the first recorded transfer prevails:

> As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise *the later transfer prevails if recorded first in such manner*, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.[103]

Under the test of this statute, C & J's rights have priority.  C & J recorded the 2005 Assignment in August 2007 long before NCCS recorded the 1988 Agreement in February 2010.

Nothing in the record suggests that the 2005 Assignment was not "taken in good faith." C & J did not have notice of the 1988 Agreement.  Nearly a year before applying for copyright registration in the Works, C & J inquired with NCCS/Nelson regarding the basis for their claim to publish the Works.[104]  Because "C & J managers had a recollection that their father had an agreement regarding royalties, but they had never seen such an agreement, nor were they certain that it had ever been in writing[,]" they "sent out letters to all known publishers of Skousen's writings (past and present), including Nelson/NCCS," inviting them "to provide copies of any documents that might be in existence in order to respect arrangements that had been made by the

---

[102] *Id.* at 101-103.

[103] 17 U.S.C. § 205(d) (emphasis added).

[104] Fact ¶ 396 and Exhibit 52.

late Skousen during his lifetime."[105]  NCCS/Nelson's response to the inquiry did not mention the 1988 Agreement[106] and NCCS/Nelson later admitted having no actual knowledge of the 1988 Agreement.[107]

C & J made reasonable inquiry years before anticipation of litigation.  NCCS/Nelson did not even know of the 1988 Agreement and provided no evidence of an exclusive transfer of copyright ownership.  Section 205(d) therefore gives priority to C & J's rights.

## X.  NCCS/Nelson Do Not Have a Valid Non-Exclusive License

NCCS/Nelson argue that some form of non-exclusive license exists.[108]  "C&J overlooks a pattern of long-standing conduct that serves to establish by estoppel if nothing else, that some form of license existed between C&J (either as agent for Skousen or in its own right) and NCCS."[109]

NCCS/Nelson claim C & J's purchases of copies of the Works from NCCS in 1988 and 2003 imply the existence of a nonexclusive license.[110]  With this conflicting, difficult history, it is hard to attribute any meaning to the purchases of books from NCCS.  Clearly, NCCS was printing and selling with Skousen's knowledge.  But in 2006, this right was investigated by C & J but  NCCS/Nelson offered no evidence of a right to publish.

The letter from C & J asked specifically for any authority for publishing:

> We understand that you may have had or may currently have an arrangement or understanding under which you are publishing one or more items authored by Dr. Skousen. We invite you to submit (to my attention) a copy of any agreement or a description of any understanding that you may have had with Dr. Skousen at your

---

[105] *Id.*

[106] Exhibit 53.

[107] Fact ¶ 326.

[108] Defendants' Opposition Memorandum 91 at 103.

[109] *Id.* at 58.

[110] *Id.* at 58-59.

earliest convenience, but in any event no later than August 31, 2006. If you do not have any such arrangement or understanding, please confirm by fax, letter or email. If you do not respond by August 31, 2006, we will conclude that you have no arrangement or understanding to publish any materials from Dr. Skousen, and the materials presented to the Skousen family will reflect that conclusion.[111]

In response to this request, Nelson's counsel sent a letter with a lengthy history of Nelson's financial involvement and then stated that "[n]o one, including Dr. Skousen during his lifetime, ever questioned the authority of NCCS to publish and print the various works . . . ."[112] NCCS/Nelson claims this history "serves to establish by estoppel if nothing else, that some form of license existed between C&J (either as agent for Skousen or in its own right) and NCCS."[113]

The lack of any written evidence makes any non-exclusive license ineffective against the August 31, 2007 registration of the C & J copyrights. Under 17 U.S.C. 205(e), only a *written nonexclusive license* can prevail over a later transfer.

A nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if -
(1) the license was taken before execution of the transfer; or
(2) the license was taken in good faith before recordation of the transfer and without notice of it.

A verbal license cannot prevail over a later transfer. Even if a verbal license could take the benefit of this statute, in this case C & J took without notice and in good faith due to the failure of NCCS/Nelson to claim any legal rights. Before recording its registrations, C & J inquired of

---

[111] Exhibit 52.

[112] Exhibit 54 at 3 (second page of letter written on behalf of Mr. Nelson).

[113] Defendants' Opposition Memorandum 91 at 58.

NCCS/Nelson as to the existence of any rights to publish the Works.[114]  The responsive letter says nothing to establish such rights.

## RECOMMENDATION

The magistrate judge recommends that the district judge find that there are no genuine issues of material fact and conclude that C & J is entitled to judgment as a matter of law; that the 2005 copyright transfers from Skousen to C & J are valid; that the 1988 Agreement was abandoned; and that NCCS/Nelson have no nonexclusive license.  Therefore, since August 31, 2007, after notice and registration of C & J's copyright claims, NCCS/Nelson's printing and distribution of the Works constitute copyright infringement.  Finally, the magistrate judge recommends Plaintiff's Motion for Partial Summary Judgment[115] be GRANTED and that Defendants' Motion to Establish Validity[116] be denied.

## NOTICES TO PARTIES

### Procedure on Report and Recommendation

Copies of this Report and Recommendation are being mailed to the parties, who are hereby notified that they have fourteen days after being served to serve and file written objections to this Report and Recommendation.[117]  The District Judge will make a de novo determination of the specific objections by the parties.  The District Judge may accept, reject, or modify this Report and Recommendation in whole or in part.  Further, the District Judge may

---

[114] Exhibit 52.

[115] Docket no. 80, filed September 27, 2010.

[116] Docket no. 83, filed September 28, 2010.

[117] 28 U.S.C. § 636(b)(1) (2010).

also receive additional evidence on the matter or recommit the matter to the Magistrate Judge with instructions.

## ORDER REGARDING SEALED DOCUMENTS

Many of the papers on these motions have been filed under seal. For that reason, this Report and Recommendation is also filed under seal.

a. Within fourteen days each party shall submit to mj.nuffer@utd.uscourts.gov (with a copy to other counsel) a redacted version of this Report and Recommendation with a letter justifying each redaction which the party recommends be made in an unsealed version of this Report and Recommendation.

b. Within twenty-eight days each party shall file with the court a redacted version of each memorandum filed with regard to these motions, and in that filing shall refer to the complete title, docket number and date of filing of the original sealed memorandum.

| Date | Doc. | Description |
|------|------|-------------|
| 09/27/2010 | 81 | Sealed Memorandum in Support of 80 Sealed Motion for Partial Summary Judgment filed by Plaintiff C&J Investments |
| 11/09/2010 | 91 | Sealed Corrected Memorandum in Opposition to 80 Sealed Motion for Partial Summary Judgment, filed by Defendants National Center for Constitutional Studies, Zeldon Nelson |
| 12/13/2010 | 96 | Reply Memorandum in Further Support re 80 Sealed Motion for Partial Summary Judgment filed by Plaintiff C&J Investments. |
| 09/28/2010 | 84 | Sealed Memorandum in Support of 83 Sealed Motion to Establish Validity filed by Defendants National Center for Constitutional Studies, Zeldon Nelson |
| 11/05/2010 | 86 | Sealed Memorandum In Opposition to 83 Sealed Motion to Establish Validity, filed by Plaintiff C&J Investments |
| 11/19/2010 | 92 | Sealed Reply Memorandum in Support of 83 Sealed Motion to Establish Validity, filed by Defendants National Center for Constitutional Studies, Zeldon Nelson |

c.  The parties shall meet and confer and within twenty-eight days shall file with the court a set of exhibits containing a redacted version of each Exhibit referenced in this Report and Recommendation.

Dated November 9, 2011.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge